UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID SNYDER, #244969

        Plaintiff,

vs.                        CIVIL NO. 1:08-cv-10047

RANDY TRUDELL, Correction Officer,    DISTRICT JUDGE THOMAS L. LUDINGTON
ERIC  AMES, Correction Officer,       MAGISTRATE. JUDGE STEVEN D. PEPE
LORI JACOBSEN, Hearing Officer

        Defendants.

_____/

## Report and Recommendation

On January 3, 2008, Plaintiff commenced this action, seeking relief under 42 U.S.C. §
1983 for violation of his civil rights.  In his Complaint, Plaintiff David Snyder, a Seventh Day
Adventist, alleges that while he was in the custody of the Michigan Department of Corrections
("MDOC"), he was given orders from prison officials to work two Saturday scheduled porter
shifts (August 10, 2007, and August 17, 2007), which if followed would have conflicted with his
religion's prohibition against working on the Sabbath, sundown Friday to sundown Saturday
(Dkt. #1, Exhs. B & G).

On March 11, 2008, Defendants filed a motion for summary judgment (Dkt. #14).
Plaintiff did not file a response.  All pre-trial matters were referred under 28 U.S.C. § 636(b)
(Dkt. #15).  For the reasons stated below, **IT IS RECOMMENDED** that Defendants' motion for
summary judgment be **GRANTED,** and this case be dismissed.

## I.    BACKGROUND

Plaintiff was a prisoner in the custody of MDOC at the time of the events leading to this action. Plaintiff is a Seventh Day Adventist (Dkt. #1, p. 3). In August of 2007, Plaintiff was assigned to work the midnight shift as a unit porter (Dkt. #1, p. 4). Prison officials ordered him to work his scheduled porter shift on two occasions, August 10, 2007, and August 17, 2007. Plaintiff refused claiming the orders conflicted with a Seventh Day Adventist prohibition against working on the Sabbath (from sundown Friday to sundown Saturday) (Dkt. #1, Attachments B & G). Failure to comply with a direct order can result in the issuance of a ticket for major misconduct. On the two Friday evenings, Plaintiff told prison officials that he refused to work, and that they should "write the ticket." (Dkt. #1, Attachments B & G). Consequently, the Plaintiff was issued tickets for major misconduct by Defendant Randy Trudell on August 10 and Defendant Eric Ames on August 17 (Dkt. #1, Attachments B & G). Plaintiff was found guilty in subsequent misconduct hearings by Defendant Lori Jacobsen on both tickets (Dkt. #1, Attachments C & H). Rehearings were denied in both instances (Dkt. #1, Attachments F & I).

The MDOC has a policy in place to allow for the reassignment of prisoners whose work assignments interfere with their religious practice. Plaintiff had requested a work accommodation for his religious practices on August 3, 2007, Work Assignment Evaluation (Dkt. #1 Attachment A), but the request had not yet been verified and granted by August 10 or 17 (Dkt. #1 p. 6 [marked "pg. 3 of 3"]). An August 15, 2007 e-mail from Chaplain Serafin confirmed Plaintiff was listed in the computer as a Seventh Day Adventist, but that he did not have a filled out religious preference form for Plaintiff (Dkt. #1, Attachments D).

On January 3, 2008, Plaintiff filed a *pro se* suit under 42 USC §1983, naming as defendants Randy Trudell, the corrections officer who issued the August 10 misconduct ticket;

Eric Ames, the corrections officer who issued the August 17 misconduct ticket; and Lori Jacobsen, the officer who adjudicated both misconduct hearings. These defendants are all being sued in both their personal and official capacities for religious discrimination. Plaintiff also indicated a desire to sue the Michigan Department of Corrections for allowing religious discrimination to take place. No damages were explicitly requested. Plaintiff does not allege that he attempted to appeal these rulings to the state circuit court, nor is there any record of such an appeal in the records of the Attorney General.

## II.  ANALYSIS

### A.  The Legal Standards

#### (1)  Legal Standard for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact.  The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985).  In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party.  *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983).  But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**B. Factual Analysis**

    (1) **<u>Defendant Lori Jacobsen</u>**

Officials protected by judicial immunity are absolutely immune from liability with respect to their judicial acts. *Shelly v. Johnson*, 849 F.2d 6th Cir. 1988); *Johnson v. Kegans*, 870 F.2d 992, 996-97 (5th Cir. 1989), *cert. denied*, 492 U.S. 921 (1989). An administrative hearing officer is protected by such immunity. *Id.* Because this is a suit apparently for damages only, administrative hearing officer Lori Jacobson is entitled to summary judgment based on her absolutely immunity from liability for her involvement on the two tickets and Plaintiff's claims against her should be dismissed.

    (2) **<u>Plaintiff's §1983 civil rights claim is cognizable</u>**

Defendants argue that the "favorable termination rule" applies in this matter requiring Plaintiff to seek his remedy in a habeas corpus proceeding, not under § 1983. In *Preiser v. Rodriguez,* 411 U.S. 475, 489-90 (1973), the United States Supreme Court held that suits

challenging the fact or duration of a state prisoner's confinement or seeking immediate or speedier release must be brought under the habeas corpus statute and not §1983.[1]  In *Preiser* an inmate was suing for the restoration of good time credits that would have allowed for his release. The Court expanded its discussion to a claim for monetary damages and declaratory relief in *Heck v. Humphrey,* 512 U.S. 477, 484-87 (1994), explaining that the requirement in malicious prosecution actions of the termination of the prior criminal proceeding in favor of the accused avoids parallel litigation over issues of probable cause and guilt, and it precludes the possibility of plaintiff succeeding in tort action after having been convicted in underlying criminal prosecution, in contravention of strong judicial policy against creation of two conflicting resolutions arising out of same or identical transaction.  These cases held that a claim for damages is not cognizable under § 1983 if a judgment for him would "necessarily imply" the invalidity of a prior conviction or sentence, unless the plaintiff can demonstrate that the conviction or sentence has previously been invalidated. *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), extended this bar to procedural challenges to a prison major misconduct findings that involved the forfeiture of 30 days good-time credit.

Defendants argue that both Michigan's good time and disciplinary credit programs affect

---

[1] Similarly, in *Wilkinson v Dotson*, 544 US 74, 81-82 (2005), in reviewing a number of prior cases concerning such matters, the Court held:

> These cases, taken together, indicate that a state prisoner's § 1983 action is barred (absent prior invalidation) – no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) – if success in that action *would necessarily demonstrate* the invalidity of confinement or its duration.

*Id* (emphasis added).

sentences.  Because of this, they argue that Plaintiff's claim should be barred under the principles of *Heck* and *Balisok* because Plaintiff's guilty finding has not been invalidated or otherwise overturned and a finding by this Court that it was unconstitutional not to allow Plaintiff a religious freedom defense to punishment for refusing to work on the Sabbath would necessarily imply the invalidity of his guilty finding.  But in *Thomas v Eby*, 481 F3d 434 (6th Cir. 2007), the Sixth Circuit held that

> disciplinary credits do not determine when a sentence expires or is completed, but only when a prisoner is subject to parole or discharge . . ."[citing  *Ryan v. Department of Corrections,* 259 Mich.App. 26, 672 N.W.2d 535 (Mich.Ct.App.2003).][Thus a]  § 1983 claim *would not necessarily* affect the duration of [the plaintiff's] sentence because prison officials would retain discretion regarding whether to grant him parole. Accordingly, the habeas exception does not bar [Prisoner]'s § 1983 claim.

*Id*. at 439-440 (emphasis added).  Under the reasoning of *Thomas*, Plaintiff received misconduct reports that could affect his first parole eligibility date and discharge date but because the MDOC retained discretion on this issue, his sentence was not necessarily altered.  While the reasoning of *Thomas v. Eby* is subject to question,[2]  this Court is bound by it. Thus it is

---

[2]  For persons incarcerated in Michigan after April 1, 1987, an inmate gets 5 days disciplinary credit for each month they are not found guilty of a major misconduct. MCL 800.33(5) states: "A prisoner shall not earn disciplinary credits [which would otherwise be earned automatically] under this subsection during any month in which the prisoner is found guilty of having committed a major misconduct." Under M.C.L.. 791.234 the parole board has jurisdiction only after a prisoner has served his minimum term under an indeterminate sentence. In a manner similar to the use of "good time" credits (the more generous scheme that was ended for those sentenced after April 1, 1987), MCL 800.33(3) states that "Accumulated disciplinary credits shall be deducted from a prisoner's minimum and maximum sentence in order to determine his or her parole eligibility date and discharge date."  Thus, good time credits and disciplinary credits shorten the time at which the Parole Board has jurisdiction to consider release.  Denial of such credits would lengthen the time before the Parole Board has jurisdiction. Thus, it seems that a loss of good time credits or a loss of disciplinary credits would delay the earliest release date for a prisoner whether he is granted parole or denied parole and required to serve his maximum sentence less unforfeited good time or disciplinary credits.   Notwithstanding

6

recommended that Plaintiff's § 1983 claim not be dismissed under the reasoning of *Heck* and

*Balisok*

(3)     **Religious Land Use and Institutionalized Persons Act "RLUIPA"**

The Religious Land Use and Institutionalized Persons Act of 2000 provides that:

> "No government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution, as
> defined in section 1997 of this title, even if the burden results from
> a rule of general applicability, unless the government demonstrates
> that imposition of the burden on that person– (1) is in furtherance
> of a compelling governmental interest; and (2) is the least
> restrictive means of furthering that compelling governmental
> interest.

42 U.S.C. § 2000cc(a)(1).

In *Cutter*, the Supreme Court upheld  "RLUIPA's institutionalized-persons provision [is]

compatible with the Establishment Clause because it alleviates exceptional government-created

---

this, *Thomas v. Eby* ,481 F.3d at 440 asserts:
> *Ryan v. Department of Corrections,* 259 Mich.App. 26, 672 N.W.2d 535
> (Mich.Ct.App.2003) . . . . notes that disciplinary "credits are explicitly tied to a
> prisoner's parole eligibility date and discharge date . . . . Thus, credits do not
> determine when a sentence expires or is completed, but only when a prisoner
> is subject to parole or discharge." Id. at 541. This passage and the statute's text
> demonstrate that . . . success in [Plaintiff] Thomas's § 1983 claim would not
> necessarily affect the duration of his sentence because prison officials would
> retain discretion regarding whether to grant him parole. Accordingly, the habeas
> exception does not bar Thomas's § 1983 claim.

While the parole board retains discretion to grant parole, it has no jurisdiction to do that until the
minimum sentence less unforfeited good time and disciplinary credits. Thus, a major misconduct
that is not overturned or otherwise vacated does seem to affect the duration of a sentence – either
by a delay of the five days before the Parole Board has jurisdiction to grant parole due to the
credit lost as a result of  the major misconduct, or if parole is denied, the inmate's discharge date
from prison would also be delayed  by  the five days because of the disciplinary credit lost on his
maximum sentence due to the major misconduct.  Thus, the premise of the *Thomas v. Eby* case
appears to be flawed.  Yet, until modified, this Court must defer to this opinion.

burdens on private religious exercise." *Cutter v. Wilkinson*, 125 S. Ct. 2113, 2121 (2005). The Court went on to note that "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Id.* at 2122.

Congress did not intend that the RLUIPA would undermine prison operations. Rather, "should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Cutter*, 125 S. Ct. at 2125 (2005); *See also Hoevenaar v. Lazaroff*, 422 F.3d 366, 370 (6th Cir. 2005) (quoting *Murphy v. Mo. Dept. of Corr.*, 372 F.3d 979, 987 (8th Cir. 2004) (citing 146 Cong. Rec. S6687 (daily ed. July 13, 2000) (statement of Senator Hatch))) (internal quotes removed) ("Congress, in passing the RLUIPA, evinced a desire to continue its goal of not overly burden[ing] prison operations, but rather intended to provide as much protection as possible to prisoners' religious rights without undermining the security, discipline, and order of those institutions."); *See also Cutter*, 125 S.Ct. at 2123 (2005) (noting that Congress intended for courts to give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.") (quoting 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Senator Hatch and Senator Kennedy on RLUIPA) (quoting S.Rep. No. 103-111, at 10 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1899, 1900)).

In the present case it must be determined whether the MDOC disciplinary action in response to Plaintiff's refusal to violate a tenet of his religion constitutes a "substantial burden"

on his exercise of religion. The Eleventh Circuit sets out an extensive history of the meaning of "substantial burden":

> The Supreme Court's definition of "substantial burden" within its free exercise cases is instructive in determining what Congress understood "substantial burden" to mean in RLUIPA. The Court's articulation of what constitutes a "substantial burden" has varied over time. *See, e.g., Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (indicating that no substantial burden exists where regulation does not have "a tendency to coerce individuals into acting contrary to their religious beliefs"); *Hobbie v. Unemployment Appeals Comm'n of Fla.,* 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (finding substantial burden when government put "substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (same); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (finding a substantial burden when an individual is required to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion ... on the other"); *but see Bowen v. Roy,* 476 U.S. 693, 707-08, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (finding no substantial burden where government action interfered with, but did not coerce, an individual's religious beliefs); *Lyng,* 485 U.S. at 452, 108 S.Ct. 1319 (same).
>
> An individual's exercise of religion is "substantially burdened" if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion. *See Cheffer v. Reno,* 55 F.3d 1517, 1522 (11th Cir.1995) (applying the Religious Freedom Restoration Act, we found no substantial burden when religion did not require particular means of expressing religious view and alternative means of religious expression were available); *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater,* 2 F.3d 1514, 1550 (11th Cir.1993) (finding a substantial burden when regulation had the effect of mandating religious conduct).
>
> In interpreting the same provision of RLUIPA as we have before us today, the Seventh Circuit declared:
>> in the context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise – [ ] – effectively impracticable.

*Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir. 2003) (hereinafter " *CLUB* "). While we decline to adopt the Seventh Circuit's definition - we agree that "substantial burden" requires something more

than an incidental effect on religious exercise. The combined import of these articulations leads us to the conclusion that a "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

*Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1226 -1227 (11th Cir. 2004) (footnotes omitted).

After a similar extensive review of the case law on the subject of "substantial burden" on the exercise of religion, the Fifth Circuit concluded:

> for purposes of applying the RLUIPA in this circuit, a government action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs. And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs. [ ] We emphasize that no test for the presence of a "substantial burden" in the RLUIPA context may require that the religious exercise that is claimed to be thus burdened be central to the adherent's religious belief system.

*Adkins v. Kaspar,* 393 F.3d 559, 569-70 (5th Cir. 2004) (*footnotes omitted*). *See also Murphy v. Missouri Dept. Of Corr.*, 372 F.3d 979, 988 (8th Cir.) cert. denied, 543 U.S. 991 (2004) (No. 04-6293) ("To constitute a substantial burden, the government policy or actions: must 'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningful curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.' "); *Henderson v. Kennedy,* 265 F.3d 1072, 1074

(D.C. Cir. 2001) (denying a petition for rehearing in a suit under the still valid portion of the RFRA, the court stated that the amendments to the definition of "religious exercise" did not alter the propriety of inquiring into the importance of a religious practice when assessing whether a substantial burden exists).

According to the MDOC Handbook on Religious Groups, Seventh-Day Adventist, 8G: "Adventists do not work on the Sabbath (Saturday). Adventist prisoners should only be required to work on Saturday if the job is essential to the prison operation and the work assignment cannot be accomplished on another day."

Defendants argue that the RLUIPA is inapplicable to this case because the issuance of two misconduct tickets for his refusal to work on the Sabbath did not place a substantial burden on his exercise of religious freedom. Yet, punishing an individual for practicing a central tenet of his faith does violate RLUIPA unless the "job is essential to the prison operation and the work assignment cannot be accomplished on another day" or by some other inmate as the MDOC Handbook on Religious Groups seems to recognize. RLUIPA certainly applies to the facts of this case where Plaintiff was punished for refusing to work because of his religious beliefs. Defendants must demonstrate that its imposition of the punishment was in furtherance of a governmental interest and was the least restrictive means of furthering that compelling government interest. The Supreme Court defined compelling governmental interest as it appears in RLUIPA as one that is necessary to maintain order and safety within the institution. *Cutter v Wilkinson*, 544 US 709, 714; 125 S Ct 2113, 2118; 161 L Ed 2d 1020 (2005). In *Cutter*, the Supreme Court noted that Congress intended for courts to give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and

procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." 125 S.Ct. at 2123 (2005). "We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests." *Id*. It is assumed that having unit porters work the midnight shift on Fridays is a significant interest of the MDOC. But that could have been accommodated by using an inmate whose religion did not bar work on Friday nights.

Defendants contend that "the risk of much disorder in the prison environment" (Dkt. #14, p. 14) caused by a prisoner's refusal to follow a direct order demonstrates a compelling government interest. While generally requiring inmates to comply with orders of corrections officers is a compelling interest, RLUIPA may require that a defense to the offense of Disobeying a Direct Order include a not guilty finding when the order is to violate a central tenet of one's faith in addition to the three defenses of (i.) conflicting with another order, (ii.) physical inability to comply or (iii.) significant risk of serious harm if the inmate complies that the hearing officer, Defendant Jacobson, stated were available defenses. Yet, in order for an inmate to assert a RLUIPA protected right not to work on certain days or to defend against a misconduct tickets for refusing to work, a penal institution's need to maintain order could reasonably require that the inmate seek and obtain approval for a work exemption detail for Fridays and complete a religious preference form as apparently MDOC did require. It appears that had Plaintiff been able to produce a religious preference form or other written document showing he was a Seventh Day Adventist and exempted from working sundown Friday through sundown Saturday, he would not have received the ticket. Had the August 3, 2007, Work Assignment Evaluation been

responded to before August 10 or 17, this problem would likely have been avoided. Because Plaintiff's request for a work accommodation based on his religious needs had not been processed, Plaintiff was put in a position to choose between violating the Sabbath and being subject to disciplinary action. Whether this was because Plaintiff had failed to complete a religious preference form or request for a work exemption on the Sabbath in a timely fashion or whether MDOC was tardy in approving it is unclear, but this need not be determined in the present case. What does seem clear is that Corrections Officers Trudell and Ames were not involved in any such failing. If there was a RLUIPA violation it is not clear it was committed by Corrections Officers Trudell and Ames who were complying with MDOC procedures in the absence of some written documentation that Plaintiff was exempted from working on the Sabbath.

### (4)    **The First Amendment**

As to the Establishment Clause, Defendants contend that the only issue is whether Plaintiff's disobedience is protected behavior in a prison setting. The First Amendment to the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend I. However, "[t]he First Amendment's Free Exercise Clause does not inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct." *Cutter v Wilkinson*, 544 US 709 at 714; 125 S Ct 2113 at 2118; 161 L Ed 2d 1020 (2005). The Supreme Court has recognized that a prisoner retains only "those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."*Pell v Procunier*, 417 US 817, 822; 94 S Ct 2800, 2804; 41 L Ed 2d 495 (1974)   As the Supreme Court

noted in *Price v Johnston*, "[l]awful incarceration brings about withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."*Price v Johnston*, 334 US 266, 285; 68 S Ct 1049, 1060; 92 L Ed 1356 (1948).  When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological objectives. *Turner v Safley*, 482 US 78 at 89; 107 S Ct 2254 at 2261, 96 L Ed 2d 64 (1987).

In determining whether the prison's policy of convicting inmates of major misconduct when they refuse to obey a direct order, the Court must look at four factors: (1) valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. The governmental interest must be a legitimate and a neutral one; (2) whether there are alternative means of exercising the right remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of ready alternatives.  *Id*. at 90-91.

As to the first factor, a valid, rational connection between the regulation and the legitimate governmental interest, Defendants assert that ensuring the safety and order of the prison environment is a legitimate governmental interest, and the connection between this end and the regulation requiring prisoners' obedience is self-evident (Dkt. #14, p. 16).  The regulation is an absolute one punishing non-compliance with a directive irrespective of the reason behind the prisoner's decision to disobey.  Issuing a misconduct ticket for every violation surely is an effective means of having orders followed by inmates.  This factor is construed in favor of the constitutionality of the regulation.

14

The second factor of providing an alternative means to exercising the right, however, is not quite as clear.  Defendants contend that because they only interfered on two occasions and accommodations were available to avoid such interference in the future and deference should be given to the Defendant corrections officers as they gauged the validity of the prison regulation, there was no significant curtailment of Plaintiff's exercise of religion.  While the Defendant corrections officers likely did not know about the validity of the prison regulation (*See Qualified Immunity infra.*), the Plaintiff was not afforded an alternative opportunity to observe the Sabbath on the two occasions in question because work is strictly prohibited on the Sabbath, any work would violate this tenet of his religious beliefs.[3]  As such, this factor weighs in favor of the Plaintiff.

In regards to the third factor, if Plaintiff's request for the accommodation had been processed prior to the two incidents, then the impact of the accommodation on the guards and other inmates would have been minimal.  This, however, was not the situation in the present case.  For whatever reasons, Plaintiff's request for special accommodations based on his religious practices went unheeded for a couple weeks.  At the time when he was to report to work the Defendant corrections officers had no information, other than Plaintiff's word, that Plaintiff should be exempted from his work shift.  Defendant corrections officers ordered Plaintiff to work, an order which Plaintiff refused.  Yet, it is unclear how detrimental to prison security, the authority of guards or license of inmates it would be to allow a hearing officer to

---

[3] Allowing an inmate an exemption from working on the Sabbath or allowing a defense to a charge of Disobeying a Direct Order when it is found that the order given was to violate a central tenet of one's faith would have been alternative means of accommodating Plaintiff's religious need.

accept as a defense to a charge of Disobeying a Direct Order that the order given was to violate a

central tenet of one's faith. Absent further hearing and finding of facts on this issue summary

judgment is inappropriate at this time.

As to the fourth factor of a ready alternative, the prison's practice of issuing misconduct

tickets to inmates who refuse to obey a direct order increases the likelihood of cooperation by the

inmates, which is essential to the order and safety of the prison environment. The *Turner*

decision make it clear that "[t]his is not a 'least restrictive alternative' test: prison officials do not

have to set up and then shoot down every conceivable alternative method of accommodating the

claimants constitutional complaint." *Turner* at 90-91. It is not apparent that there is required

alternative means of inducing compliance with a direct order from prison officials.

In balancing these factors, the Supreme Court noted that the penological objectives is

committed to the considered judgment of prison administrators, who are actually charged with

and trained in the running of the particular institution under examination. *O'Lone v Estate of

Shabazz*, 482 US at 349; 107 S Ct 2400 at 2404; 96 L Ed 2d 282 (1987) (Internal Quotations

Omitted.) Defendants argue that given the legitimate penological objectives, summary judgment

should be granted in their favor. Defendants, however, have failed to demonstrate that there is

no genuine issue of material fact on the issue of the alternative means available to accommodate

Plaintiff's rights to exercise his religion. As such, it is recommended that summary judgment not

be granted on the First Amendment issue.

(3) **Immunity**

Plaintiff's claims against the Defendants Trudell and Ames are barred by qualified

immunity. Government officials who perform discretionary functions are generally entitled to

qualified immunity from individual liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995); *Thomas v. Whalen*, 51 F.3d 1285, 1289 (6th Cir. 1995), *cert. denied*, 116 S. Ct. 518 (1995); *Pray v. Sandusky*, 49 F.3d 1154, 1157-58 (6th Cir. 1995). Qualified immunity is an affirmative defense and the plaintiff need not anticipate it in the complaint. *Gomez v. Toledo*, 446 U.S. 635 (1980). The Sixth Circuit has held that if a defendant raises a qualified immunity defense, the plaintiff bears the burden of showing that the constitutional right alleged to have been violated was clearly established at the time of the alleged violation. *Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1174 (6th Cir. 1988); *Dominique v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987). "[I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals, or itself." *Seiter*, 858 F.2d at 1177.

Qualified immunity seeks to ensure that defendants "reasonably can anticipate when their conduct may give rise to liability," *Davis v. Scherer*, 468 U.S. 183, 195 (1984), by imposing liability only if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635 640 (1987). "[I]n effect the qualified immunity test is simply the adaption of the fair warning standard to give officials (and, ultimately, governments) the same protections from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes." *United States v. Lanier*, 117 S. Ct. 1219, 1227 (1997). Splits of authority among the circuits is "a circumstance [that] may be taken into account in deciding whether the

warning is fair enough" but it is not a categorical bar to a finding of liability. *Id.* To be "clearly established" there need not be prior relevant case law "on all fours" or deciding "the very action in question." *Anderson,* 483 U.S. at 640.[4]  *See also McBride v. Village of Michiana,* 100 F.3d 457, 461 (6th Cir. 1996). *McCloud v. Testa,* 97 F.3d 1536, 1557 (6th Cir. 1996), noted that if courts required  prior precedent on the specific facts at issue in the pending case, "qualified immunity would be converted into a nearly absolute barrier to recovering damages against an individual government actor. . . ."

The Supreme Court in *Siegert v. Gilley*, 500 U.S. 226, 111 S. Ct. 1789 (1991), set out the "analytical structure under which a claim of qualified immunity should be addressed."  The Court is to determine whether the plaintiff has alleged the violation of a clearly established constitutional right.  This is a purely legal question.  It involves two steps.  The first step is to determine whether the alleged conduct violates any constitutionally protected right at all.  The second step is to determine whether that constitutional right was clearly established at the time of the defendant's action or failure to act.  If the answer to the first question is in the negative, the Court need not consider the second question because if no constitutional right exists, no such right would have been clearly established.

---

[4] As noted in *United States v. Lanier,* 117 S. Ct. 1219, 1227 (1997), there is no single level of specificity sufficient in every instance. In some circumstance, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. [citation omitted] But general statements of law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful, *Anderson, supra,* at 640 . . . .

The question whether an official is protected by qualified immunity does not turn on the subjective good faith of the defendants, but rather turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Harlow*, 457 U.S. at 818-19; *Mackay v. Dyke*, 29 F.3d 1086, 1094 (6th Cir. 1994). Qualified immunity is appropriate either on the basis that the right allegedly violated was not at the time "clearly established," or if "clearly established," was one that a "reasonable" person in the defendant's position could have failed to appreciate would be violated by his conduct. *Pray v. Sandusky*, 49 F.3d 1154, 1157 (6th Cir. 1995) (quoting *Anderson*, 483 U.S. at 640). Thus, even where the general rule is clearly established, it may be open to question whether the defendant's specific action comes withing the scope of the general rule. Officials may be entitled to qualified immunity when their decision is reasonable, even though mistaken, in determining that their action did not fall within the scope of a clearly established general rule. *Id*. The Supreme Court urges that the lower courts follow the *Siegert* sequence and first determine whether plaintiff has alleged a constitutional deprivation at all before considering -- or too readily determining -- that it was not clearly established.

From the above discussion, there is a genuine issue of material fact at step one of the qualified immunity analysis on the question of a First Amendment constitutional right being violated by the alleged conduct. Regarding the RLUIPA claim against Corrections Officers Trudell and Ames it is unclear their actions were violations since they were not responsible for issuing or denying the work exemption to Plaintiff for he being a Seventh Day Adventist.

At the second step of the *Siegert* test, on the facts of this case it cannot be said that reasonable corrections officers in Trudell and Ames's position would have recognized Plaintiff's

First Amendment or RLUIPA rights.   Plaintiff's request for a special accommodation based on his religious needs had not been processed through official channels at the time of the incidents. Prison officials are not required to accept a prisoner's bald assertion of religious faith.  *See Jackson v Mann,* 196 F 3d 316, 320 (6th Cir. 1999).  Given the context in which Defendants Trudell and Ames acted, they could not have reasonably known that Plaintiff was exercising a constitutionally or RLUIPA  protected right or simply refusing to appear for his work shift. Absent some MDOC documentation of Plaintiff's religious right to refuse work on the Sabbath at the time of his misconduct, it would not have been clear to a reasonable corrections officer in this situation that issuing a misconduct ticket to the Plaintiff would be unlawful. Therefore, the Plaintiff has failed to show that he can overcome the officers' qualified immunity.  Defendants Trudell and Ames are entitled to summary judgment on qualified immunity grounds.

## III.    RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED**, and the case against each of them be dismissed.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation.  *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,1373

(6th Cir. 1987). Pursuant to E.D. Mich. LR 72(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections. A party may file a reply brief within 5 days of service of a response. The reply shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.

Dated: September 25, 2008                          s/ Steven D. Pepe
Ann Arbor, MI                                     United States Magistrate Judge


## CERTIFICATE OF SERVICE

This is to certify that on September 25, 2008, I electronically filed the foregoing and I hereby certify that I have mailed a copy to the non-ECF parties.


                              s/ V. Sims
                              Courtroom Deputy for Magistrate
                              Judge Steven D. Pepe